[Counsel on signature page]

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| ABDI NAZEMIAN, BRIAN KEENE, and STEWART O'NAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NVIDIA Corporation,<br><br>Defendant. | Case No. 4:24-cv-01454-JST<br>Case No. 4:24-cv-02655-JST<br><br>**DECLARATION OF JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' BRIEF IN SUPPORT OF THEIR PROPOSED ESI PROTOCOL AND PROTECTIVE ORDER** |
| ANDRES DUBUS III and SUSAN ORLEAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NVIDIA Corporation,<br><br>Defendant. | |

Case Nos. 4:24-cv-01454-JST; 4:24-cv-02655-JST

DECLARATION OF JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' BRIEF IN SUPPORT OF THEIR PROPOSED ESI PROTOCOL AND PROTECTIVE ORDER

I, Joseph R. Saveri, declare as follows:

1. I am an attorney duly licensed to practice in the State of California. I am a partner and founder of the Joseph Saveri Law Firm, LLP and counsel of record for Plaintiffs Abdi Nazemian, Brian Keene, and Stewart O'Nan in this matter. I have personal knowledge of the matters stated herein and, if called upon, could competently testify thereto. I make this declaration pursuant to 28 U.S.C. § 1746 and in accordance with Section G(b) of the Court's Standing Order for all Civil Cases Before District Judge Jon S. Tigar.

2. On October 21, 2024, the Court instructed the parties to engage in further negotiations on issues in dispute regarding the ESI Protocol and Protective Order to govern in this action and to submit competing proposals along with briefs not to exceed five pages by November 4, 2024 (ECF No. 82), a date the Court later extended to November 18, 2024 (ECF Nos. 85, 87).

3. Plaintiffs hereby submit their proposed ESI Protocol and Protective Order, versions of those documents redlined against the Northern District of California's model stipulated orders, and this Declaration explaining each modification to the model stipulated orders, in accordance with the Court's Standing Order.

## ESI PROTOCOL

4. A true and correct copy of the parties' jointly proposed Stipulation & Order Regarding Discovery of Electronically Stored Information, which includes Plaintiffs' specific competing proposals on certain provisions ("Plaintiffs' ESI Protocol"), is attached hereto as Exhibit A.

5. A true and correct copy of a redline identifying changes made to the model stipulated ESI order ("Standard Model ESI Order") in Plaintiffs' ESI Protocol is attached hereto as Exhibit D.

6. Plaintiffs' ESI Protocol contains extensive edits to the Standard Model ESI Order, which reflect modern litigation practice, and are designed to minimize and narrow potential disputes about ESI that require judicial intervention while promoting transparency and efficiency, as follows:

7. **Paragraph 1:** The "Purpose" section in the proposal differs from the model order by explicitly clarifying that it supplements existing discovery rules rather than replacing them.

8. **Paragraph 2:** The "Modification" section in the proposal differs from the model order

by offering clearer and more flexible terms for altering the Order. Specifically, it emphasizes that modifications can be made not only at the Court's discretion but also through stipulation between the parties.

9. **Paragraph 3:** The "Planning for Discovery" section in the proposal introduces more specific and structured requirements compared to the model order. While both orders emphasize the need for collaboration in planning discovery, the parties' proposal mandates that the parties disclose data sources, specify anticipated date ranges for relevant documents, and categorize ESI containing pertinent information

10. **Paragraph 4:** The "Electronic Communications" section in the proposal introduces specific obligations that are not present in the model order. It requires each party to disclose, within 30 days of the Order's entry, any use of electronic communications services or applications, along with details about subscription and retention settings. Additionally, the proposal mandates that the parties meet and confer to establish parameters for data collection, production format, and any unique challenges these platforms present.

11. **Paragraph 5**: The "Preservation" section in the proposal provides a more comprehensive and proactive approach to preservation obligations compared to the model order. It requires detailed disclosure of any categories or sources of discoverable information that may not be preserved, along with a written explanation of the reasons for non-preservation. The proposal further outlines specific steps for ensuring preservation, such as issuing litigation hold notices for business entities and requiring counsel to provide written explanations of preservation duties for non-business entities.

12. **Paragraph 6:** The "Scope of Production Requests" section in the proposal differs from the model order by explicitly reinforcing the principles of proportionality and relevance as outlined in Rule 26(b)(1).

13. **Paragraph 7:** The "ESI Liaison Counsel" section in the proposal differs from the model order by specifying that each e-discovery liaison must be outside counsel for the party. This requirement emphasizes the use of external experts who either possess or have access to detailed technical knowledge about ESI, covering aspects like data location, format, and search

1  methodologies.

2  14. **Paragraph 8:** The "Electronic Communications Discovery" provision dealing with
3  custodial limits in Plaintiffs' ESI Protocol sets a structured approach by capping the number of
4  custodians that a requesting party can ask for at 24 per producing party. If a party wishes to exceed
5  this limit, they must seek leave of the court and demonstrate good cause. This requirement for court
6  approval ensures that requests remain reasonable and proportional, preventing excessive or
7  burdensome discovery efforts.

8  15. Additionally, the proposal clarifies that the named plaintiffs collectively are
9  considered a single requesting party when serving email production requests on NVIDIA, which
10 streamlines the process. The proposal also provides flexibility by allowing the parties to jointly
11 agree to modify the custodian limit without court intervention, and it preserves the right to add
12 more custodians as discovery unfolds.

13 16. **Paragraph 9:** The "Search Term Methodology" section in Plaintiffs' proposal
14 establishes a clear and collaborative framework for using search terms in ESI discovery. The
15 proposal requires a party intending to use search terms to disclose those terms and any additional
16 parameters used to filter documents, such as date ranges or file type exclusions. This transparency
17 allows the requesting party to review and, if necessary, object to the proposed terms and parameters
18 if they believe these would result in discovery deficiencies.

19 17. If objections arise, the parties must meet and confer within 14 days to address the
20 concerns, during which the producing party must provide a hit report related to the proposed search
21 terms. This promotes a cooperative approach to refining search methodologies.

22 18. **Paragraph 10:** The "Hit Reports" section in Plaintiffs' proposal provides a detailed
23 process for assessing the effectiveness of search terms used to identify relevant documents. Within
24 seven days of the requesting party serving search terms, the producing party must generate and
25 provide a search term hit report. This report includes critical metrics for each custodian, such as the
26 total number of documents with hits for each term, the number of unique documents that only
27 match that term, and the number of related family members requiring review.

28 19. The proposal requires the parties to meet and confer to address any disagreements over

the search terms, ensuring collaboration and refinement to optimize search efficiency. It also includes a provision for the parties to revisit and potentially adjust the limits on the number of hits per term or custodian, ensuring that the search remains proportional to the case's needs.

20. **Paragraph 11:** The "Custodial Mobile Device and Communications Data" provision in the proposal introduces specific obligations and procedures for handling ESI located on custodial devices. The proposal requires the producing party to take reasonable steps to identify any unique, responsive, and relevant ESI on devices in their possession, custody, or control. This includes evaluating a range of data types, such as voicemails, text messages, chat applications, and media files.

21. The proposal mandates that custodians certify in writing whether they have used non-enterprise communication platforms for relevant discussions. If they have not, this certification can be provided to the requesting party. If they have, the producing party must conduct a reasonable investigation into which communications should be collected. This step-by-step process ensures that mobile device data is adequately considered, emphasizing transparency and reasonable diligence.

22. **Paragraph 12:** The "Technology Assisted Review" (TAR) section in the proposal introduces specific guidelines for the use of TAR and other technology-based methods, which are more detailed and restrictive compared to the model order. The proposal allows the use of TAR to enhance the efficiency of discovery but imposes conditions to ensure transparency and collaboration. Specifically, if a producing party intends to use any automated methods to exclude documents from review or production, they must notify the receiving party and give them an opportunity to object.

23. **Paragraph 13:** The "Production Format for ESI" section in the proposal outlines specific and detailed requirements for the production of electronically stored information, offering a more comprehensive framework compared to the model order.

24. **Paragraph 14:** The "Metadata" section in the proposal is more specific than the model order, as it mandates that Load or DAT files include metadata fields listed in Appendices A and B, provided the metadata exists and was captured at the time of collection. This level of detail

ensures that relevant metadata is included to support the review and usability of ESI. The proposal also specifies technical specifications for metadata production, which the model order may not outline as comprehensively.

25. Additionally, the proposal includes a practical safeguard: if metadata does not exist or is not reasonably accessible, the order does not require parties to extract or produce it. This provision balances thorough metadata production with the practical limitations of data availability and accessibility, offering a more nuanced approach compared to the model order's potential lack of specificity.

26. **Paragraph 15:** The "Embedded Files" section in the proposal differs from the model order by providing explicit instructions on handling embedded files. It requires that embedded files be produced with family relationships preserved, meaning that they must be assigned sequential Bates numbers and have "BegAttach" and "EndAttach" metadata fields to indicate their association with the parent document. This ensures that embedded files are properly linked and organized within document productions, promoting consistency and clarity.

27. Additionally, the proposal exempts embedded images in emails from separate production unless requested by the receiving party, reducing unnecessary production burdens while still allowing for flexibility. It also specifies that a producing party does not need to review or produce extracted embedded OLE documents if the parent document will be provided in native format. These provisions add a layer of efficiency and practicality not present in the model order.

28. **Paragraph 16:** The "Hyperlinks" section in Plaintiffs' proposal provides a thorough and technologically responsive approach for handling documents referenced through hyperlinks. It requires the producing party to use available technology to connect hyperlinked documents with related emails or parent documents in native format. The proposal mandates populating the BEGATTACH and ENDATTACH metadata fields to preserve family relationships, which is more detailed than what is covered in the model order.

29. If documents cannot be extracted from links at the time of collection, the proposal requires the parties to meet and confer to explore alternative solutions, such as capturing and producing additional metadata fields like URLs. This collaborative approach ensures that the

process remains flexible and adaptive to technical challenges. The proposal also accommodates requests for hyperlinked documents that were not automatically produced, provided that the requesting party gives a reasonable basis for the request, along with hyperlinks, Bates numbers, and relevance justifications.

30. **Paragraph 17:** The "Duplicates" section in the proposal outlines a detailed and methodical approach to handling duplicate ESI, which goes beyond the standard model order. The proposal specifies that a party is only required to produce a single copy of a responsive document and defines "Duplicate ESI" as files that are exact duplicates based on hash values like MD5, SHA-1, or SHA-256. This ensures that unnecessary duplication is minimized, streamlining the production process.

31. **Paragraph 18:** The "Privilege Logs" section in the proposal provides an enhanced and organized approach compared to the model order, introducing several key differences. The proposal mandates that privilege logs be produced in a searchable and sortable Excel format, facilitating easier analysis for the receiving party. This specific requirement increases the usability of the logs, which the model order may not explicitly address.

32. The proposal also outlines comprehensive metadata requirements for each entry, such as control numbers, document dates, custodians, authors, recipients, subject lines, filenames, file extensions, and Bates numbers. These details ensure that each log entry provides enough information to evaluate the claim of privilege without revealing the privileged content, offering more granularity than typically seen in the model order.

33. **Paragraph 19:** The "Challenging Privilege" section in the proposal introduces a structured and time-bound process for disputing claims of privilege, work product, or other protections, which is more detailed than what is typically provided in a model order.

34. Following the producing party's response, the proposal requires a meet-and-confer session within seven days to attempt resolution, with the possibility of extending this time frame by mutual agreement. If the dispute remains unresolved, the parties may escalate the matter to the court.

35. **Paragraph 20:** The "Model Data" section in the proposal introduces provisions

specifically tailored to the unique challenges of producing complex data related to the models at issue. Unlike the model order, which may not address this type of data, the proposal emphasizes the need for collaboration to determine the most effective and manageable way to produce Model Data. This includes discussions about producing raw data files, summaries, reports, code repositories, and annotated code.

36. The proposal also allows the parties to explore options such as sample productions or other mechanisms to address the size, structure, and complexity of Model Data efficiently. This approach acknowledges the technical and logistical challenges associated with model-related data and encourages the parties to find practical and case-specific solutions through a cooperative process, offering a more flexible and tailored strategy compared to the standard model order.

37. **Paragraph 21:** The "Structured Data" section in Plaintiffs' proposal introduces a pragmatic and methodical approach to producing data from structured systems, which is more detailed than what the model order might specify. The proposal defines structured data as information stored in databases or data sets governed by specific form and content rules, ensuring clarity about the types of data being addressed.

38. It allows the producing party to deliver data in an existing and reasonably available report format, provided they disclose all available report options and any data dictionaries in writing. This ensures that the requesting party has a clear understanding of the available data formats and allows for a more informed discussion about production. The proposal includes a 14-day meet-and-confer period to resolve disputes about the report format, promoting collaboration and timely resolution.

39. If a suitable existing report is not available, the producing party must attempt to export the data in a Microsoft Excel-compatible format, ensuring the data remains useful. If this is not feasible, the proposal outlines a final option for making the data available for inspection on the original system or providing direct access. This structured, step-by-step approach ensures that data is produced in a usable and efficient manner, while offering flexibility to accommodate the complexities of structured data systems. Compared to the model order, this proposal provides a clearer and more comprehensive framework for handling structured data production, ensuring

Case Nos. 4:24-cv-01454-JST; 4:24-cv-02655-JST    7

DECLARATION IN SUPPORT OF JOSEPH R. SAVERI IN SUPPORT OF PLAINTIFFS' BRIEF
IN SUPPORT OF THEIR PROPOSED ESI PROTOCOL AND PROTECTIVE ORDER

transparency and efficiency.

40. **Paragraph 22:** The "Documents Protected From Discovery" section in the proposal adopts the protection offered by Federal Rule of Evidence 502(d) and explicitly states that the production of privileged or work-product-protected documents, even if inadvertent, does not constitute a waiver of privilege in this case or in any other proceeding. This provision provides robust protection for privileged materials and clarifies that their unintentional disclosure, such as during a mass production, will not undermine the privilege.

## PROTECTIVE ORDER

41. A true and correct copy of the parties' proposed Protective Order, including Plaintiffs' competing proposals ("Plaintiffs' Protective Order"), is attached hereto as Exhibit B.

42. A true and correct copy of a redline identifying changes made to the Northern District's Model Stipulated Protective Order in Plaintiffs' Protective Order is attached hereto as Exhibit E.

43. Plaintiffs' Protective Order contains extensive edits to the Model Protective Order, which are based on modern litigation practice and minimize the risk of over-designation and related inefficiencies, while maintaining robust protections for sensitive materials, as follows:

44. **Section 2.8**: The parties Protective Order defines "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" (AEO) material with greater precision and adaptability compared to the Model Order. Plaintiffs specify types of documents warranting this designation, such as detailed technical diagrams and proprietary model architectures, while the Model Order broadly references extremely sensitive information posing a substantial risk of harm if disclosed. Plaintiffs' tailored definition clarifies the scope, reducing ambiguity and potential disputes. Plaintiffs also maintain a non-limiting framework, avoiding unnecessary rigidity and allowing for heightened protection of newly identified sensitive information, balancing robust confidentiality with litigation efficiency.

45. **Section 2.9**: The parties added a designation for "HIGHLY CONFIDENTIAL -- SOURCE CODE," establishing a specific category for the most sensitive technical information. This definition recognizes the unique importance of source code in AI-related litigation, providing maximum protection while still allowing necessary access. *See* ¶ 38. The parties also included a

provision for extending this designation to non-Source Code materials through meet and confer discussions to create flexibility and protect closely related technical data. This approach anticipates complex discovery issues surrounding AI model architecture and training data.

46.     **Section 2.15**: The parties' definition of "Professional Vendors" aligns closely with the Model Order but adds important specificity to clarify permissible litigation support activities. The definition includes services like photocopying, videotaping, translating, exhibit preparation, and ESI management, ensuring that only those with a direct role in supporting the litigation may access sensitive information. By explicitly enumerating both employees and subcontractors within this category, the parties provide a clearer scope of who qualifies as a vendor, thereby enhancing compliance and minimizing ambiguity in data handling protocols.

47.     **Section 2.18**: The parties propose defining "Source Code" as the human-readable instructions written in a programming language that dictate a software application's operations, explicitly encompassing algorithms, model weights, model parameters, logic, and functions that determine program behavior. This precise language extends beyond traditional notions of source code to include elements fundamental to machine learning models, reflecting the case's technical complexities. By incorporating these components, Plaintiffs aim to ensure comprehensive protection for core technological assets that could reveal critical intellectual property if disclosed, thereby addressing the unique sensitivities of advanced software systems.

48.     **Section 2.19**: The parties propose defining "Training Data" as any information or dataset, in any form, utilized to develop, improve, refine, or validate machine learning models or AI systems. This includes collections of text, images, or other content employed to teach such systems to recognize patterns, generate outputs, or make predictions. Plaintiffs' definition covers both raw data and any preprocessed, transformed, or derivative versions of the data, ensuring comprehensive protection of all materials integral to the training process. This language captures the full scope of data types involved in training, reflecting the complexities of modern AI development and safeguarding critical proprietary content from unauthorized disclosure.

49.     **Section 7.3**: The parties propose detailed procedures under Section 7.3 for disclosing "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" and, optionally, "HIGHLY

CONFIDENTIAL – SOURCE CODE" information, which carefully limit access to essential litigation personnel. The provisions ensure that such information is disclosed only to individuals or entities necessary for litigation, such as Outside Counsel of Record, designated non-competitive House Counsel, vetted Experts, court personnel, court reporters, consultants, and Professional Vendors, all of whom must agree to be bound by the Order. Restrictions on witness disclosure are added to minimize risk, and precautions are taken for deposition testimony, balancing the need for effective litigation against the imperative to protect sensitive information.

50. **Section 7.4**: Plaintiffs added Section 7.4 to establish a strict protocol for disclosing "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" and "HIGHLY CONFIDENTIAL – SOURCE CODE" information to Designated House Counsel or Experts. Under section (a)(1), any request to disclose to Designated House Counsel must detail the individual's identity, residence, and job duties to assess potential involvement in competitive decision-making. For Experts under (a)(2), the protocol mandates a comprehensive disclosure, including the Expert's identity, affiliations, compensation history, and litigation experience over the past five years. The Designating Party has ten days to object, and the parties must meet and confer to attempt resolution. If unresolved, the Designating Party may seek a protective order, but failure to do so within the specified timeframe permits disclosure, ensuring both protection of sensitive material and efficient litigation progress.

51. **Section 16**: Plaintiffs propose a comprehensive non-waiver and clawback protocol to address the inadvertent production of privileged or protected materials, pursuant to Federal Rule of Evidence 502(d) and Federal Rule of Civil Procedure 26(b)(5)(B). Under this agreement, the production of such materials does not constitute a waiver of privilege in the current litigation or any other proceeding. A party may assert a clawback request, requiring the return, destruction, or sequestration of inadvertently produced materials. If the receiving party challenges the privilege claim, they must sequester the material and engage in a meet-and-confer process. If unresolved, the matter may be brought before the Court, with strict limitations on the use of the challenged material solely for the motion. The protocol ensures rigorous steps for deleting clawed-back materials, covering all electronic and backup systems, and provides for alternative measures where deletion is

infeasible.

Dated: November 18, 2024

Respectfully submitted,

By: */s/ Joseph R. Saveri*
   Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Christopher K.L. Young (State Bar No. 318371)
Elissa A. Buchanan (State Bar No. 249996)
Evan Creutz (State Bar No. 349728)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile:  (415) 395-9940
Email:     jsaveri@saverilawfirm.com
           cyoung@saverilawfirm.com
           eabuchanan@saverilawfirm.com
           ecreutz@saverilawfirm.com

Matthew Butterick (State Bar No. 250953)
1920 Hillhurst Avenue, #406
Los Angeles, CA 90027
Telephone: (323) 968-2632
Facsimile:  (415) 395-9940
Email:     mb@buttericklaw.com

Brian D. Clark (*pro hac vice*)
Laura M. Matson (*pro hac vice*)
Arielle Wagner (*pro hac vice*)
Eura Chang (*pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612)339-6900
Facsimile:  (612)339-0981
Email:     bdclark@locklaw.com
           lmmatson@locklaw.com
           aswagner@locklaw.com
           echang@locklaw.com

*Attorneys for Plaintiffs and the Proposed Class in the* Nazemian *Action*

Bryan L. Clobes (*pro hac vice*)
Alexander J. Sweatman (*pro hac vice*)
Mohammed A. Rathur (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 South LaSalle Street, Suite 3210
Chicago, IL 60603
Telephone: 312-782-4880
   bclobes@caffertyclobes.com
   asweatman@caffertyclobes.com
   mrathur@caffertyclobes.com

Amy E. Keller (*pro hac vice*)
Nada Djordjevic (*pro hac vice*)
James A. Ulwick (*pro hac vice*)
**DiCELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel. (312) 214-7900
   akeller@dicellolevitt.com
   ndjordjevic@dicellolevitt.com
   julwick@dicellolevitt.com

David A. Straite (*pro hac vice*)
**DiCELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel. (646) 933-1000
   dstraite@dicellolevitt.com

*Attorneys for Plaintiffs and the Proposed Class in the* Dubus *Action*